UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

_____

Nos. 13-1869(L) and 13-1924
(1:08-cv-01642-WMN)

_____

BRADLEY D. PETRY, Individually and on behalf of a Class of persons
similarly situated; STACEY M. MILLER, Individually and on behalf of a Class of
persons similarly situated,

Appellants/Cross-Appellees

v.

PROSPERITY MORTGAGE COMPANY; WELLS FARGO BANK, N.A.;
WALKER JACKSON MORTGAGE CORPORATION, formerly doing business
as Prosperity Mortgage Corporation; WELLS FARGO VENTURES, LLC; THE
LONG & FOSTER COMPANIES, INC.; LONG & FOSTER REAL ESTATE,
INC.,

Appellees/Cross-Appellants.

_____

**OPENING AND RESPONSIVE BRIEF
OF APPELLEES/CROSS-APPELLANTS**

_____

# TABLE OF CONTENTS

Page

I.    JURISDICTIONAL STATEMENT ...................................................1

II.   STATEMENT OF THE ISSUES ...................................................1

III.  STATEMENT OF THE CASE ......................................................3

    A.   Relevant Provisions Of The Maryland Finder's Fee Act...................3

    B.   Procedural History.................................................................4

IV.   STATEMENT OF FACTS ............................................................13

V.    SUMMARY OF ARGUMENT ......................................................17

    A.   Appeal..................................................................................17

    B.   Conditional Cross-Appeal .....................................................20

VI.   ARGUMENT............................................................................21

    A.   The District Court Correctly Entered Judgment In Defendants'
       Favor On Plaintiffs' FFA Claim.............................................21

        1.   The District Court correctly interpreted and applied the
            definition of "finder's fee"............................................21

        2.   As an alternative ground for affirmance, the plain language
            of the FFA does not apply to Prosperity because it is
            identified as the lender in the loan documents.........................26

    B.   Plaintiffs' FFA Claims Are Precluded By The *Minter* Verdict;
       Plaintiffs Are Judicially Estopped From Asserting That The
       Verdict Does Not Apply To All Class Members .............................30

        1.   The *Minter* verdict bars plaintiffs' claims ................................30

        2.   The class is judicially estopped from pursuing its FFA
            claims ...........................................................................36

i

C.    The District Court Correctly Held That Aider And Abettor
      Liability Does Not Apply To Claims Under The Finder's Fee Act....39

D.    Ample Grounds Exist To Affirm The District Court's Ruling That
      Long & Foster And Wells Fargo Could Not Be Held Liable For
      Conspiracy To Violate The FFA ........................................................44

VII.   ARGUMENT IN SUPPORT OF CROSS-APPEAL ...................................50

A.    The District Court Erred In Certifying The Class.............................51

      1.    Standard of Review.................................................................51

      2.    Under the correct interpretation of Rule 23, which is more
            than a mere pleading standard, plaintiffs' FFA claims
            satisfied neither commonality nor predominance....................52

      3.    The District Court abused its discretion in certifying time-
            barred FFA claims...................................................................55

B.    The District Court Incorrectly Applied A 12-Year Statute Of
      Limitations To Plaintiffs' FFA Claim.................................................58

VIII.  CONCLUSION...........................................................................................63

ii

## <u>TABLE OF AUTHORITIES</u>

**Page**

### <u>Federal Cases</u>

*Beddall v. State St. Bank & Trust Co.,*
    137 F.3d 12 (1st Cir. 1998)..................................................................37

*Bell v. Bd. of Educ., Akron Pub. Sch.,*
    683 F.2d 963 (6th Cir. 1982).................................................................35

*BEP, Inc. v. Atkinson,*
    174 F. Supp. 2d 400 (D. Md. 2001) ....................................... 46, 47, 49

*Central Bank of Denver v. First Interstate Bank,*
    511 U.S. 164 (1994).................................................................................39

*Corley v. Entergy Corp.,*
    220 F.R.D. 478 (E.D. Tex. 2004).........................................................56

*Daly v. Harris,*
    209 F.R.D. 180 (D. Haw. 2002).............................................................56

*Deposit Bank of Frankfort v. Bd. of Councilmen,*
    191 U.S. 499 (1903)................................................................................34

*Doe v. Chao,*
    306 F.3d 170 (4th Cir. 2002), *aff'd on other grounds,*
    540 U.S. 614 (2004)........................................................... 20, 51, 56

*Ealy v. Pinkerton Gov't Servs., Inc.,*
    514 F. App'x 299 (4th Cir. 2013) .......................................................53

*Folio v. City of Clarksburg,*
    134 F.3d 1211 (4th Cir. 1998) .............................................................37

*Glaser v. Enzo Biochem, Inc.,*
    126 Fed. App'x. 593 (4th Cir. 2005) ..................................................50

*Hatfill v. The N.Y. Times Co.,*
    532 F.3d 312 (4th Cir. 2008)................................................................50

iii

*Humphrey v. Int'l Paper*,
  2003 WL 22111093 (N.D. Ill. Sept. 11, 2003) .....................................................56

*In re Hoang*,
  2012 WL 195316 (Bankr. D. Md. Jan. 23, 2012) ......................................... 47, 49

*In re Hoang*,
  2013 WL 1105021 (D. Md. Mar. 15, 2013).........................................................47

*In re Microsoft Corp. Antitrust Litig.*
  355 F.3d 322 (4th Cir. 2004).............................................................................30

*Kramer v. Perez*,
  595 F.3d 825 (8th Cir. 2010)..............................................................................41

*Lombel v. Flagstar Bank, F.S.B.*,
  2013 U.S. Dist. LEXIS 147193 (D. Md. Oct. 11, 2013) ............................. 45, 49

*M.D. v. Perry*,
  675 F.3d 832 (5th Cir. 2012)..............................................................................51

*Marshall v. James B. Nutter & Co.*,
  2013 WL 3353475 (D. Md. July 2, 2013)...........................................................49

*McHugh v. Mayor*,
  2011 WL 1135853 (D. Md. Mar. 24, 2011).........................................................48

*Moreno v. Summit Mortgage Corp.*,
  364 F.3d 574 (5th Cir. 2004)................................................................................5

*Nat'l City Bank of Ind. v. Turnbaugh*,
  463 F.3d 325 (4th Cir. 2006) ..............................................................................51

*Paccar Inc. v. Elliot Wilson Capitol Trucks LLC*,
  905 F. Supp. 2d 675 (D. Md. 2012) ........................................................ 47, 48, 49

*Pharmacia & Upjohn Co. v. Mylan Pharm., Inc.*,
  170 F.3d 1373 (Fed. Cir. 1999)..........................................................................34

*Project Vote/Voting for Am., Inc. v. Long*,
  682 F.3d 331 (4th Cir. 2012)..............................................................................27

iv

*Rice v. Paladin Enters.*,
    128 F.3d 233 (4th Cir. 1997)................................................................43

*Riddick by Riddick v. Sch. Bd. of City of Norfolk*,
    784 F.2d 521 (4th Cir. 1986)...............................................................35

*Shenker v. Laureate Education, Inc.*,
    983 A.2d 408 (Md. 2009)........................................................ 19, 44, 46

*Singer v. Dungan*,
    45 F.3d 823 (4th Cir. 1995)..................................................................58

*Sondel v. Northwest Airlines, Inc.*,
    56 F.3d 934 (8th Cir. 1995)..................................................................35

*Teague v. Bakker*,
    35 F.3d 978 (4th Cir. 1994)..................................................................40

*Thorn v. Jefferson-Pilot Life Ins. Co.*,
    445 F.3d 311 (4th Cir. 2006).................................................... 51, 52, 57

*Wade v. Danek Med., Inc.*,
    182 F.3d 281 (4th Cir. 1999)................................................................55

*Wal-Mart Stores, Inc. v. Dukes*,
    131 S. Ct. 2541 (2011) ........................................................... 20, 52

*Warwick Corp. v. Md. Dept. of Transp.*,
    573 F. Supp. 1011 (D. Md. 1983), *aff'd* 735 F.2d 1359 (4th Cir. 1984)............34

## State Cases

*AGV Sports Group, Inc. v. Protus IP Solutions, Inc.*,
    10 A.3d 745 (Md. 2010)........................................................ 59, 61, 62

*Alleco Inc. v. Harry & Jeanette Weinberg Found., Inc.*,
    665 A.2d 1038 (Md. 1995)........................................................ 42, 46

*Alleco, Inc. v. Harry & Jeanette Weinberg Found., Inc.*,
    639 A.2d 173 (Md. Ct. Spec. App. 1994)...........................................46

*Cent. Collection Unit v. Kossol,*
  771 A.2d 501 (Md. Ct. Spec. App. 2001) ..............................................44

*Coner v. Morris S. Berman Unlimited, Inc.,*
  501 A.2d 458 (Md. Ct. Spec. App. 1985) ..................................... 23, 25

*Consumer Protection Division v. Morgan,*
  874 A.2d 919 (Md. 2005) .........................................................................42

*Davis v. State,*
  43 A.3d 1044 (Md. 2012) ........................................................................40

*Dual Inc. v. Lockheed Martin Corp.,*
  827 A.2d 1095 (Md. 2004) ......................................................................57

*Eastside Vend Distributors v. Coca-Cola Enterprises,*
  2006 WL 1516012 (Cir. Ct. Balt. City May 8, 2006) .................. 41, 49

*Etgen v. Washington County Bldg. & Loan Ass'n,*
  41 A.2d 290 (Md. 1945) ..........................................................................48

*Green v. N.B.S., Inc.,*
  952 A.2d 364 (Md. Ct. Spec. App. 2008) ...........................................43

*Greene Tree Home Owners Ass'n v. Greene Tree Assocs.,*
  749 A.2d 806 (Md. 2000) ........................................................................59

*Hartford Accident & Indem. Co. v. Scarlett Harbor Assocs.,*
  674 A.2d 106 (Md. Ct. Spec. App. 1996) ...........................................43

*Jones v. Nationscredit Fin. Servs. Cor*p.
  Case No. 24-C-02-000572 (Cir. Cit. Balt. City Aug. 9, 2005) .............. 17, 28, 43

*Kohler v. State,*
  36 A.3d 1013 (Md. Ct. Spec. App. 2012) ...........................................43

*Mackey v. Compass Marketing, Inc.,*
  892 A.2d 479 (Md. Ct. Spec. App. 2006) ...........................................48

*Manikhi v. Mass Transit Admin.,*
  758 A.2d 95 (Md. 2000) .................................................................... 47, 49

vi

*Marriott Emples. Fed. Credit Union v. Motor Vehicle Admin.*,
    697 A.2d 455 (Md. 1997).......................................................................41

*MaryCLE, LLC v. First Choice Internet, Inc.*,
    890 A.2d 818 (Md. Ct. Spec. App. 2006).............................................44

*Master Fin. Inc. v. Crowder*,
    972 A.2d 864 (Md. 2009)............................................................... 59, 62

*Mayor & City Council of Baltimore v. Household Finance Corp.*,
    176 A. 480 (Md. 1935).........................................................................62

*N. Star Int'l Trucks, Inc. v. Navistar, Inc.*,
    2010 Minn. Dist. LEXIS 266 (Minn. Dist. Ct. June 30, 2010)............43

*People's Ins. Counsel Div. v. Allstate Ins. Co.*,
    969 A.2d 971 (Md. 2009)............................................................... 23, 27

*Sell v. Gama*,
    294 P.3d 421 (Ariz. 2013)....................................................................43

*St. Paul at Chase Corp. v. Mfrs. Life Ins. Co.*,
    278 A.2d 12 (Md. 1971)........................................................................60

*Sweeney v. Savs. First Mortg., LLC*,
    879 A.2d 1037 (Md. 2005)............................................................. 17, 47

*T-Up, Inc. v. Consumer Prot. Div.*,
    801 A.2d 173 (Md. Ct. Spec. App. 2002).............................................44

*Wasserman v. Kay*,
    14 A.3d 1193 (Md. Ct. Spec. App. 2011).......................................48, 49

*West Virginia C. & P. R. Co. v. State*,
    54 A. 669, 671-72 (Md. 1903) ............................................................46

## Federal Statutes and Regulations

12 U.S.C. § 2601 *et seq*.............................................................................5

12 U.S.C. § 2607..........................................................................................31

vii

24 C.F.R. § 3500.2 ................................................................. 5, 54

28 U.S.C. § 1291 ...........................................................................1

28 U.S.C. § 1332 ...........................................................................1

## State Statutes and Regulations

COMAR 09.03.06.02(B)(6) ............................................ 3, 18, 27, 29

MD. CODE, COM. LAW § 12-405 ........................................... 23, 24

MD. CODE, COM. LAW § 12-406 ........................................... 23, 24

MD. CODE, COM. LAW § 12-801(c) (1975 Repl. Vol.) (1980 Suppl.) ....................15

MD. CODE, COM. LAW § 12-801 .................................... *passim*

MD. CODE, COM. LAW § 12-804 ...............................................3, 4

MD. CODE, COM. LAW § 12-805 ...................................................3

MD. CODE, COM. LAW § 12-807 ........................................ 4, 47, 62

MD. CODE, CTS. & JUD. PROC. § 5-101 ...................................59

MD. CODE, CTS. & JUD. PROC. § 5-102 ...................................59

MD. CODE, CTS. & JUD. PROC. § 5-203 ...................................55

MD. CODE, FIN. INST. § 11-501 ....................................... 3, 18, 27

MD. CODE, NAT. RES. § 5-409 ...............................................41

MD. CODE, STATE GOV'T § 20-101 .......................................41

MD. CODE, STATE GOV'T § 20-801.......................................41

## Other Sources

FED. R. CIV. P. 23 .......................................................................52

viii

## I.    JURISDICTIONAL STATEMENT

Defendants-appellees agree with the jurisdictional statement submitted by plaintiffs-appellants Bradley and Stacey Petry ("the Petrys" or "plaintiffs"), with the following elaboration.  The District Court had subject matter jurisdiction over this action pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d), because (1) at least one member of the proposed plaintiff class is a citizen of a state different from at least one defendant; (2) the amount in controversy exceeds $5,000,000; and (3) the number of members in the class is greater than 100. Defendants timely noticed their conditional cross-appeal on July 22, 2013.  [D.E. 412].  This Court has jurisdiction over the conditional cross-appeal, which seeks review of a final judgment, pursuant to 28 U.S.C. § 1291.

## II.    STATEMENT OF THE ISSUES

A.    Did the District Court correctly hold that where Prosperity Mortgage Company ("Prosperity") only charged plaintiffs reasonable and below-market fees for the application, processing and underwriting of plaintiffs' loan and no other lender charged any other fees, Prosperity did not charge plaintiffs any fee that could constitute a "finder's fee" within the meaning of the Maryland Finder's Fee Act ("FFA" or "Act"), MD. CODE, COM. LAW §§ 12-801 *et seq.*?

1

B.      Should the District Court's judgment on the FFA claims be affirmed on the alternative grounds that (1) Prosperity fell into an express exception to the definition of "broker" under the plain language of the FFA, and (2) the jury in the companion *Minter* case found that Prosperity did not refer loans to Wells Fargo and thus was not a broker, such that the *Petry* class is collaterally and/or judicially estopped from asserting that Prosperity is a broker?

C.      Did the District Court correctly hold that aider and abettor liability is not available under the FFA?

D.      Did the District Court correctly hold that Long & Foster Real Estate, Inc. ("Long & Foster") and Wells Fargo Bank, N.A. ("Wells Fargo Bank") could not be held liable for conspiracy to violate the FFA when neither defendant itself was capable of violating the FFA?

E.      If this Court reaches the conditional cross-appeal:  (1) did the District Court err in certifying a class consisting of every Maryland borrower in Prosperity's 19-year history; and (2) did the District Court err in applying a 12-year statute of limitations to FFA claims?

2

## III.    STATEMENT OF THE CASE

### A.    <u>Relevant Provisions Of The Maryland Finder's Fee Act</u>

The Maryland Finder's Fee Act prohibits a mortgage broker from charging a fee to a borrower for finding a mortgage lender (a "finder's fee") "unless it is pursuant to a written agreement between the mortgage broker and the borrower which is separate and distinct from any other document."[1]  FFA § 12-805(d)(1).

The law defines a "mortgage broker" as a person who:

(1) For a fee or other valuable consideration, whether received directly or indirectly, aids or assists a borrower in obtaining a mortgage loan; and

(2) ***Is not named as a lender in the agreement, note, deed of trust, or other evidence of the indebtedness.***

FFA § 12-801(e); *see also* MD. CODE, FIN. INST. § 11-501(i) (emphasis added); MD. CODE REGS. ("COMAR") 09.03.06.02(B)(6).  In addition, a mortgage broker may not charge a finder's fee "in any transaction in which the mortgage broker … is the lender …."  FFA § 12-804(e).

The FFA limits the definition of "finder's fee" to:

---

[1]    The terms of any such written agreement, per Section 12-805(d)(2), must include the amount of the finder's fee and "[c]ontain a representation by the mortgage broker that the mortgage broker is acting as a mortgage broker and not as a lender in the transaction."

3

any compensation or commission directly or indirectly imposed by a broker and paid by or on behalf of the borrower for the broker's services in procuring, arranging, or otherwise assisting a borrower in obtaining a loan or advance of money.

FFA § 12-801(d).

The FFA does not apply to fees charged "for the actual cost of … [a]ny appraisal, credit report," or certain other "good[s] or service[s]."  FFA § 12-804(b).

As a penalty for violating the FFA, the mortgage broker "shall forfeit to the borrower the greater of:

"(1) Three times the amount of the finder's fee collected; or

(2) The sum of $500."

FFA § 12-807.

### B.   Procedural History

On June 23, 2008, plaintiffs initiated this case by filing a class action complaint in the District of Maryland.  Plaintiffs designated the case as related to an earlier lawsuit their counsel had already filed against the same defendants styled *Minter, et al. v. Wells Fargo Bank, et al.*, No. 07-CV-03442-WMN ("*Minter*"). Both the *Minter* and *Petry* cases rested on the theory that: "Prosperity Mortgage was formed as a 'joint venture' by Long & Foster and Wells Fargo in order to facilitate the collection of unlawful referral fees and kickbacks in violation of both

4

Maryland and Federal law." [D.E. 195 ¶ 1]; *see also* [*Minter* D.E. 263 ¶ 1]. While in *Minter* the plaintiffs primarily claimed that the Prosperity business model violated federal law – the Real Estate Settlement Procedures Act ("RESPA"), 12 U.S.C. § 2601 *et seq.* – in this case, they claimed that it violated the FFA.

More specifically, plaintiffs alleged that Prosperity was a "sham" entity that held itself out as a lender, but was really a mortgage broker "established to procure, arrange or otherwise assist Long & Foster customers in obtaining mortgage loans funded by Wells Fargo." [*Id.* ¶ 2]. Plaintiffs alleged that Prosperity's loans were "table-funded," a term of art meaning that funding is supplied by a wholesale lender for loans closing in a broker's name, and the loans are contemporaneously assigned to the funding lender. *See* [D.E. 195 ¶ 3]; *see also* 24 C.F.R. § 3500.2(b); *Moreno v. Summit Mortgage Corp.*, 364 F.3d 574, 576 (5th Cir. 2004).

According to plaintiffs, because Prosperity obtained its funds from a warehouse line of credit provided by Wells Fargo, Wells Fargo was the real lender, not Prosperity. [D.E. 195 ¶¶ 27-28]. Under this arrangement, Prosperity purportedly served as an undisclosed broker and nominal lender that referred all of its customers' loans to Wells Fargo, and received "finder's fees" "allocated" "on

5

each HUD-1 Settlement Statement" ("HUD-1") as a "reward" in violation of the FFA. [*Id.* ¶¶ 3, 53].

Plaintiffs purchased their home at 1121 Carroll Street in Baltimore on October 21, 2005. Long & Foster acted as their real estate broker. [*Id.* ¶ 59]. According to plaintiffs, "Prosperity Mortgage, in turn, procured, arranged or otherwise assisted Plaintiffs … in obtaining their mortgage loan funding through Wells Fargo." [*Id.* ¶ 60]. Plaintiffs' loan documents identified Prosperity as their lender. [*Id.* ¶ 61]. Plaintiffs obtained a $220,000 mortgage loan for which Prosperity charged $1,290 in fees: underwriting ($390), processing ($490), and application ($410). While none of these fees was designated as a finder's fee (or a broker's fee) on their HUD-1, plaintiffs characterized all these fees as finder's fees and claimed they violated the FFA. [*Id.* ¶¶ 48, 65].[2] Plaintiffs further alleged that Long & Foster and Wells Fargo were liable under the FFA as aiders and abettors and co-conspirators. [*Id.* ¶¶ 90-98]. Because this case is factually related to *Minter* and the same counsel are involved in both actions, the District Court consolidated *Petry* with *Minter* for discovery, class certification briefing, and

---

[2]    The HUD-1 attached to the Complaint does not reflect that any entity, other than Prosperity, charged fees for serving as plaintiffs' lender. [D.E. 1-1].

6

motions practice, and the District Court's decisions were often published under the *Minter* caption. (As noted below, however, *Minter* was tried separately.)

On February 11, 2009, the District Court granted in part, and denied in part, defendants' Motion to Dismiss or, in the Alternative, for Summary Judgment. [D.E. 49]. The District Court determined that plaintiffs had sufficiently pled that Prosperity violated the FFA by allegedly serving as both plaintiffs' broker and lender and charging an undisclosed finder's fee. [*Id.* at 9-12]. The District Court rejected defendants' argument that, because Prosperity was identified as the lender in the loan documents, it did not fall within the FFA's definition of "mortgage broker." [*Id.* at 8-9]. The District Court held that whether Prosperity actually performed any services for the fees that it charged was a factual dispute requiring full discovery. [*Id.* at 11]. The District Court did dismiss plaintiffs' claim that Long & Foster itself was a mortgage broker and their claims that Long & Foster and Wells Fargo Bank were derivatively liable for Prosperity's alleged FFA violations under a theory of aiding and abetting. [*Id.* at 12-14].

On May 3, 2011, the District Court certified classes in both *Minter* and *Petry*. [D.E. 186]. The *Petry* class was defined as:

> All persons who entered into a mortgage loan transaction secured by real estate located in Maryland where (1) Prosperity Mortgage (2) is identified as the mortgage lender in the operative documents relating to the transaction,

7

(3) Prosperity Mortgage received a fee for services in the transaction, and (4) the loan was funded through a Wells Fargo line of credit.

[*Id.* at 80]. The class was not limited by time period; it captured "all claimants who transacted with Prosperity at any time dating to Prosperity's inception." [*Id.* at 66.] The District Court applied a 12-year statute of limitations to the FFA claims and reasoned that everyone outside the limitations period could potentially "prove the elements required to equitably toll otherwise untimely claims." [*Id.* at 72-73]. The certification order drew no distinction between timely and time-barred claimants, and allowed plaintiffs to represent all of them. The Court held that common issues predominated because "Plaintiffs *allege[d]* Prosperity . . . was by its nature always a mortgage broker and never a lender." [*Id.* at 77] (emphasis added).[3] According to the District Court, the "central, dominating question in *Petry*" was whether Prosperity was "merely a broker for Wells Fargo loans despite its outward representations to the contrary …." [*Id.* at 76].

---

[3]     Plaintiffs have always sought to have it both ways; they attempt to impugn Prosperity as acting as both a mortgage broker and "nominal" lender to fit within Section 12-804(e) of the FFA, but at the same time they have asserted throughout the *Petry* and *Minter* cases that Wells Fargo was the true lender. Indeed, they now assert that table-funding "marries brokering and lending," (Opening Brief of Appellants at 20 (Doc. 36) ("App. Brief")), but that is not so. In a table-funding arrangement, there is no change to the traditional distinction between a mortgage broker and mortgage lender. The only difference is that the broker's name appears on the loan documents. Wells Fargo *and* Prosperity could not have both served as lender.

8

On May 30, 2012, the District Court issued an order bifurcating the liability and damage phases of the trial.  [D.E. 262].

Following class certification, the parties engaged in extensive, consolidated fact and expert discovery in *Petry* and *Minter*.  Based on a statistical analysis of *actual pricing data* for Prosperity customers and customers of Wells Fargo retail branches in the same geographic footprint, defendants' expert, Dr. Marsha Courchane, determined that Prosperity's price structure was consistent with pricing offered by correspondent lenders, and its actual loan charges to class members were, on average, *lower* than Wells Fargo's retail pricing, which was representative of the retail lending market.  *See* [D.E. 299-6] (Expert Report of Marsha Courchane dated May 31, 2012).  Plaintiffs did not rebut Dr. Courchane's analysis.

On February 14, 2013, the District Court ruled on motions for summary judgment filed in *Petry* and *Minter*.  [D.E. 348].  The Court noted that, in both cases, plaintiffs had relied on the same basic factual allegations: "Plaintiffs have always alleged that Prosperity was a sham entity created to provide a pipeline of mortgage referrals from Long & Foster to Wells Fargo and a means for Wells Fargo to funnel kickbacks to Long & Foster for those referrals…. Plaintiffs further allege that Wells Fargo was the actual lender in the mortgages at issue."  [*Id.* at 3];

9

*see also* [*id.* at 10]. In both cases, the District Court held that there were factual disputes, among other things, as to whether Prosperity was a broker and referred loans to Wells Fargo. [*Id.* at 46-47]. As to the FFA, there was the additional question of whether Prosperity charged any finder's fees. [*Id.*]. The Court did, however, grant summary judgment in defendants' favor on the claim of conspiracy to violate the FFA (Count II). [*Id.* at 48-50]. The only affirmative claim that then remained in *Petry* was against Prosperity under the FFA.

Approaching trial, which was scheduled for March 18 through April 4, 2013, [D.E. 279], several key facts refuting plaintiffs' theory were undisputed: Prosperity was identified as the lender in plaintiffs' loan documents; Prosperity's loan prices, including origination fees, were competitive in the retail marketplace; no other lender charged fees in plaintiffs' or class members' transactions; Prosperity did not charge any fees designated as a "finder's fee" or "broker fee;" and Prosperity provided actual loan origination services to plaintiffs. The liability questions for trial were two-fold: (1) did Prosperity serve as an undisclosed broker by referring plaintiffs' loan to Wells Fargo, which "table-funded" the loan in Prosperity's name; and, if so, (2) did Prosperity charge plaintiffs a finder's fee?

In the proposed joint pre-trial order ("PTO") ([D.E. 365]), plaintiffs asserted that the second question was irrelevant because, if Prosperity were found to be a

10

broker, *all* of the fees that Prosperity charged in connection with any loan

transaction – no matter what purpose the fee served or what services Prosperity

provided in exchange for it – would constitute finder's fees that would have to be

disgorged and trebled.  [*Id.* at 27-28].  Plaintiffs contended that tabulation of the

finder's fee could occur in the second, damages phase of the trial.  [*Id.* at 29-30].

Thus, under plaintiffs' theory of the case, they did not need to identify any

"finder's fee" charged by Prosperity during the liability phase of the case.

Plaintiffs' approach is inconsistent with the plain language of the FFA, the

cases interpreting the Act, and the intent of the statute.  Accordingly, on February

26, 2013, defendants filed a motion ([D.E. 364]) seeking guidance from the

District Court as to what liability questions would be proposed to the jury in the

first phase of the trial.

On March 12, 2013, the District Court issued a letter addressing that issue

and examining "what constitutes a 'finder's fee' under the Maryland Finder's Fee

Act."  *See* [D.E. 389].  In the letter, the District Court stated the view "that fees for

work actually performed were permissible."  The letter confirmed that, using

"plain common sense," "finder's fees" include only fees charged by "one entity for

finding another."  [*Id.* at 2.]  The District Court stated that the following fees are

not finder's fees: (1) fees Prosperity charged for the "actual cost" of "goods or

11

services required to complete the loan application process and paid to third parties"; and (2) "fees for work actually performed by [Prosperity]." [D.E. 389 at 1-2] ("If Prosperity performed the work for which it charged *and Wells Fargo did not also perform or charge for that work*, there are no redundant or excessive fees.") (emphasis added). The Court also confirmed that "Plaintiffs have the burden to show that they paid some excessive or redundant fee to Wells Fargo (in the guise of Prosperity) for finding Wells Fargo as lender." [*Id.* at 2].

At a pre-trial hearing the next day, plaintiffs conceded that "we don't today have the evidence that is required to meet the burden that is spelled out in [the Court's March 12 Letter]." *See* [D.E. 394 at 3]. Based on this admission, the District Court took the case off the trial calendar and, on March 20, 2013, defendants filed a Joint Motion for Order of Dismissal and Entry of Judgment. [D.E. 399]. On the same day, plaintiffs filed a Motion to Certify Questions to the Maryland Court of Appeals ([D.E. 398]).

*Minter* was tried separately between May 6 and June 6, 2013. The jury returned a verdict for defendants and found, among other things, that (1) Prosperity was not a sham and (2) Prosperity did not refer the *Minter* plaintiffs to Wells Fargo. [*Minter* D.E. 615 at 1-2].

12

Following the *Minter* trial, on June 20, 2013, the District Court in *Petry*

entered judgment for defendants and denied plaintiffs' Motion to Certify.  [D.E.

407].  In its decision, the District Court noted that "[n]ot only have Plaintiffs

abandoned the claim that the fees paid to Prosperity were excessive, it is

significant that there is no claim that there were redundant or duplicative fees paid

to Wells Fargo or any other entity in addition to the fees paid to Prosperity."  [*Id.* at

2].  Further:

> The Court now definitively holds for the same reasons that it
> tentatively opined in its March 12, 2013, letter that fees charged for
> work actually performed are not impermissible finder's fees under the
> FFA.  In light of Plaintiffs' acknowledgment that they have no
> evidence to present to a jury that Prosperity charged any
> impermissible finder's fees under this view of the FFA, Defendants
> are entitled to judgment as to Plaintiffs' FFA claim.

[*Id.* at 7].

## IV.    STATEMENT OF FACTS

Prosperity was formed in 1993 as an equally-owned joint venture between

Prosperity Mortgage Corporation (now Walker Jackson Mortgage Corporation)

and Norwest Mortgage, Inc. (a predecessor to Wells Fargo Bank).  Prosperity is

licensed to operate, and is regulated, as a mortgage lender in seven states,

including Maryland.  [D.E. 300 ¶¶ 20-23].

While there is overlap between some of the services provided by mortgage

brokers and retail mortgage lenders, such as taking the application, running a credit

13

report, and obtaining an appraisal, lenders like Prosperity provide numerous services that mortgage brokers *do not*, such as underwriting, preparing the loan documents, obtaining the closing funds, and authorizing the closing and funding of the loan.  *See* [D.E. 299-17 at 27-30].

Prosperity provides substantial, core mortgage lending services necessary to originate, process, and fund loans, and it charges competitively-priced fees for those services.  *See* [D.E. 28-5 ¶ 6; D.E. 28-7 ¶¶ 6-8; D.E. 130 ¶ 12; D.E. 297-1 at 13-19; D.E. 299-5 at 9-15, 18-21, 24-25, 27, 30, 56-57; D.E. 303 ¶¶ 2, 4-7, 9; *Minter* D.E. 40-5 ¶¶ 23, 37].  As addressed by defendants' expert, Marsha Courchane, Prosperity's price structure is consistent with pricing offered by other correspondent lenders, not that of a mortgage broker.

Nevertheless, plaintiffs wrongly alleged that Prosperity merely table-funded its loans as a broker for Wells Fargo Bank.  As addressed at length in the *Minter* trial, Prosperity does not table-fund.  It funds mortgage loans by borrowing funds from a warehouse line of credit obtained from Wells Fargo Bank.[4]  [*Minter* D.E.

---

[4]     Prosperity's warehouse line is established through a series of contracts that have been updated over the course of Prosperity's existence, including a Credit Agreement, a Collateral Account Agreement, a Pledge and Security Agreement, and a Demand Note.  [D.E. 28-10, Exs. 3-6); *Minter* D.E. 40-4, Ex. 6 thereto; D.E. 298-34].  As the testimony throughout *Minter* established, brokers do not have warehouse lines; correspondent lenders do.  *Minter* Day 7 Transcript at 193:14-25,

40-4 ¶ 11 and Exs. thereto; D.E. 130 ¶¶ 25-32, 39].  A warehouse line of credit is a

short-term revolving line of credit offered by a warehouse lender to correspondent

lenders to fund their loans.  [D.E. 421-17 at 8-12].  Correspondent lenders then sell

those loans and, usually, their servicing rights to investors – sometimes to the

warehouse lender or its affiliates, sometimes to independent investors.  [*Id.* at 7;

D.E. 421-13 at 6].  The correspondent lenders then use the sale proceeds to pay off

the warehouse line of credit.[5]  [D.E. 427-17 at 9].  Prosperity sold its loans and

---

196:16-2; *Minter* Day 9 Transcript at 68:8-69:6; *Minter* Day 11 Transcript at
198:13-199:2; *Minter* Day 14 Day Transcript at 110:6-111:1, 168:2-169:14].

[5]      After closing, most correspondent lenders sell the servicing rights along with
the loan itself.  Recognizing the value of the servicing income stream, investors
will pay a fee called a service release premium ("SRP") to obtain these servicing
rights.  These SRPs are not finder's fees.  Prosperity's loan pricing was equal to or
less than Wells Fargo's and the SRP was not a cost that was imposed directly or
indirectly on the Petrys for services in procuring, arranging, or otherwise assisting
them in obtaining a loan or advance of money.  [D.E. 299-6].

        In a game of semantics, plaintiffs have argued that these fees are the same as
"yield spread premiums" ("YSP") that constitute compensation by a mortgage
lender to a mortgage broker.  App. Brief at 25.  A YSP, however, results from an
increase in the interest rate paid by the borrower, and it is not a finder's fee
because it was not "paid by or on behalf of the borrower."  FFA § 12-801(d)
(2010).  Here, no YSP was paid to Prosperity in connection with the Petry loan
(because, as a lender, Prosperity did not receive YSP fees).  Regardless, a March
18, 1980 memo from the Department of Licensing and Regulation expressly states
that the FFA does not apply to lender-paid broker compensation (*i.e.*, YSPs).  *See*
[D.E. 328-4].  This conclusion is also apparent from a comparison of MD. CODE,
COM. LAW § 12-801(c) (1975 Repl. Vol.) (1980 Suppl.) *available at* ([D.E. 337-6
at 13]) with FFA § 12-801(d) (2010).  Plaintiffs included SRPs in their sweeping

15

servicing rights to Wells Fargo Bank as well as to other investors such as U.S.

Bank and Nationwide.  Prosperity's audited financial statements reflect these sales,

reporting mortgage loans held for sale on each year's balance sheet, with amounts

ranging from $1.2 million in 1995 to $102 million in 2010.  [D.E. 297-1 at 16;

D.E. 300-4 to 300-19].

Prosperity was the Petrys' lender.  To purchase their home, the Petrys

obtained a no-money-down, conventional first-lien mortgage loan for $220,000

from Prosperity.  [D.E. 143-4 at 5, 22].  The loan was funded by Prosperity and

closed in Prosperity's name.  [D.E. 28-6 ¶ 7, Exs. 1-2 thereto].  Prosperity provided

the core mortgage lending services for the Petry loan from application to closing.

It sold the Petrys' loan to Wells Fargo Bank in the secondary market after the

closing.  [D.E. 28-6 ¶ 10].  In exchange for its lending services, Prosperity charged

a total of $1,290, which constituted only 0.59% of the Petrys' total loan amount.

[D.E. 143-4 at 22-23].  Included in the application fee were the cost of the

appraisal ($350) and credit report ($29.40).  [D.E. 1-1; D.E. 299-5 at 53].

Prosperity did not charge the Petrys a finder's fee, and the seller, not the Petrys,

---

disgorgement theory of damages to maximize the amount of potential damages
even though doing so has no plausible basis under the FFA.

16

paid the loan origination fees that Prosperity charged.  [D.E. 143-4 at 24].  No other entity charged lending fees in connection with the Petrys' loan.

## V.    SUMMARY OF ARGUMENT

### A.    <u>Appeal</u>

Early in this case, the District Court framed two questions necessary to resolve plaintiffs' claims:  (1) did Prosperity act "as both Plaintiffs' mortgage broker and nominal lender?" and, if so, (2) did Prosperity collect "a fee for these actions?"  [D.E. 49 at 9].  The District Court's approach was consistent with the legislative intent behind the FFA, which is "to protect consumers from … redundant and excessive fees."  [*Id.*] (quoting *Jones v. Nationscredit Fin. Servs. Corp.*, Case No. 24-C-02-000572 (Cir. Ct. Balt. City Aug. 9, 2005) ("*Jones*")).  The Maryland Court of Appeals has acknowledged the limited application of the FFA.  It has observed that "[t]he Maryland Finder's Fee Law is very narrow in its scope: it applies only to mortgage brokers and the fees they charge borrowers."  *Sweeney v. Savs. First Mortg., LLC*, 879 A.2d 1037, 1048-49 (Md. 2005).

Ignoring the FFA's limited parameters, plaintiffs' claims took on a breadth that was unsupported by the FFA's plain language, its intent, or the manner in which it has been enforced by the Office of the Maryland Commissioner of Financial Regulation ("OCFR").

17

None of Prosperity's charges constituted a finder's fee, duplicative or otherwise. They represented standard lender fees for services Prosperity performed. [D.E. 299-6 at 32-33]. There was no fee designated as a "broker's" or "finder's" fee on plaintiffs' HUD-1 statement; Prosperity did not act as a broker and "find" itself to extract an additional fee from plaintiffs; and the very limited fees that Prosperity did charge in connection with the Petry closing (*i.e.*, 0.59% of the loan amount) were reasonable for the services provided, not duplicative or excessive. [D.E. 1-1]. The District Court correctly entered judgment in defendants' favor when plaintiffs conceded that they actually had no evidence that Prosperity charged them a "finder's fee." [D.E. 394 at 3].

Even putting aside the lack of a "finder's fee," the District Court's judgment still should be affirmed on either of two alternative grounds, both of which establish that Prosperity is not a "mortgage broker" within the plain language of the FFA and it did not refer loans to Wells Fargo. First, Prosperity was identified as the lender in plaintiffs' (and every class member's) loan documents. [D.E. 28-6, Exs. 1-2 thereto] (Petrys' loan documents). Prosperity, therefore, falls into an express exception to the definition of "mortgage broker" in the FFA. *See* FFA § 12-801(e); Md. Code, Fin. Inst. § 11-501(i)(2); COMAR 09.03.06.02(B)(6).

18

Second, the same liability theory presented here − that Prosperity is a "sham" that does not make mortgage loans but instead simply brokers them to Wells Fargo as the alleged "true" lender − was rejected by the jury in the recent *Minter* trial.  The *Minter* jury, after a five week trial, expressly found that Prosperity was not a sham and did not refer the *Minter* class loans to Wells Fargo. [*Minter* D.E. 615 at 2].  Many of the *Petry* class members also belong to the *Minter* class, and those who do not affirmatively – and successfully – argued to the District Court that their transactions were no different from other class members'. Accordingly, principles of issue preclusion and judicial estoppel preclude plaintiffs from relitigating the issue that the *Minter* verdict resolved against them.

Finally, the District Court correctly determined that Long & Foster and Wells Fargo cannot be liable for aiding and abetting or conspiracy liability.  Aiding and abetting liability is not provided for by either the plain language or the narrow statutory scheme of the FFA.  The cases cited by plaintiffs on appeal do not support their arguments to the contrary.  As to plaintiffs' conspiracy claim, the District Court correctly applied *Shenker v. Laureate Education, Inc.*, 983 A.2d 408, 428 (Md. 2009), which held that a defendant who is legally incapable of committing the underlying tort alleged may not be held liable as a civil conspirator.   Further, and as an alternate ground to affirm, just as with aiding and

19

abetting, conspiracy liability is unavailable because the statute at issue does not provide for it.  For each of these reasons, and as discussed in more detail below, the District Court's judgment should be affirmed in full.

### B.    Conditional Cross-Appeal

The District Court found that the key requirements of Rule 23, including commonality, typicality, and predominance, were satisfied based on plaintiffs' merely pleading a theory that the Court found suitable.  But as the Supreme Court has since made clear, "Rule 23 does not set forth a mere pleading standard."  *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (2011).  And the District Court compounded its error by certifying time-barred claims; circuit precedent makes clear that timely plaintiffs cannot represent time-barred plaintiffs, *Doe v. Chao*, 306 F.3d 170, 184 (4th Cir. 2002), *aff'd on other grounds*, 540 U.S. 614 (2004), and in any event the individualized facts that each such plaintiff would have to show to overcome the time bar would swamp any common issues.

The District Court also erred by not applying Maryland's presumptive three-year statute of limitations.  The FFA does not qualify for the narrow exception on which the court relied, as the test set out in Maryland cases shows.

20

## VI.    ARGUMENT

### A.    The District Court Correctly Entered Judgment In Defendants' Favor On Plaintiffs' FFA Claim

#### 1.    The District Court correctly interpreted and applied the definition of "finder's fee"

Prosperity did not charge plaintiffs a "finder's fee" as the term is defined by the FFA.  Prosperity made the Petry loan and charged reasonable fees – less than one percent of the total loan amount – for the lender services it rendered, from taking plaintiffs' loan application to releasing the funds for the closing.  Plaintiffs could not show that any of Prosperity's fees were either excessive or duplicative of fees charged by Wells Fargo, which plaintiffs claimed was the true lender.  In other words, they could not show that Prosperity charged a fee for "finding" Wells Fargo.

Unable to meet their burden of identifying an actual finder's fee, plaintiffs conclusorily asserted that that every fee charged by Prosperity is necessarily a finder's fee.  Thus, they proposed, and continue to advocate for, a complete disgorgement (trebled) of all compensation Prosperity received for services connected with making loans and selling the servicing rights to those loans from 1993 through mid-2013.  *See* [D.E. 195 at 4; D.E. 324 at 11].  Under this theory, the named plaintiffs alone would seek well over $10,000, even though they did not suffer any financial injury because the seller paid all the fees on their behalf.  [D.E.

21

143-4 at 24].  The damages sought for the entire class would total approximately $914 million.  [D.E. 365 at 29-30].

Plaintiffs' approach was designed to avoid the need to ask the jury what actual finder's fee Prosperity allegedly charged in connection with plaintiffs' and each class member's loan.  Yet the fundamental question of liability under the FFA turns not just on Prosperity's status but also on whether Prosperity "charged and received an unlawful 'finder's fee.'"  [D.E. 348 at 12-13].

The District Court correctly rejected plaintiffs' position because it is inconsistent with (1) the plain language of the FFA, (2) cases interpreting the FFA, and (3) the intent of the statute as evidenced by the legislative history.

First, the FFA, by its plain language, does not purport to reach all compensation received by an alleged broker.  The FFA specifically limits finder's fees to compensation "for the broker's services *in procuring, arranging, or otherwise assisting* a borrower in obtaining a loan or advance of money."  FFA § 12-801(d) (emphasis added).  Plaintiffs emphasize the word "services" (App. Brief at 19), but ignore the statute's specification of *which* services can generate a finder's fee.  Interpreting the FFA to cover every fee charged for any service would read the "procuring, arranging, or otherwise assisting" limitation out of the statute, in addition to being inconsistent with the very nature of the term "finder's fee."

22

Reasonable fees charged for providing lender services in *making* a loan simply do not fall within the plain meaning of the phrase "procuring, arranging, or otherwise assisting a borrower in obtaining a loan."

Further, the language of the FFA must be read to be consistent with the statute's purpose. *See People's Ins. Counsel Div. v. Allstate Ins. Co.*, 969 A.2d 971, 979-80 (Md. 2009). As the only pertinent Maryland appellate decision explains, the FFA allows lenders to keep "remuneration that the law allows." *Coner v. Morris S. Berman Unlimited, Inc.*, 501 A.2d 458, 463 (Md. Ct. Spec. App. 1985). Thus, the sole Maryland appellate precedent bearing on the scope of the FFA where a broker is alleged to have simultaneously acted as the lender – as here – rejects plaintiffs' theory and confirms that the statutory purpose is to ban fees for referring a borrower to oneself, not fees for ordinary lender services.

In *Coner*, the Court of Special Appeals interpreted Maryland law applicable to brokers (the FFA) and lenders (MD. CODE, COM. LAW §§ 12-405 and 12-406). Mortgage Masters, the alleged broker, was a sole proprietorship that charged and collected a finder's fee without performing arms-length broker services; the lender, Morris Berman, was the husband of Mortgage Masters' owner. *Coner*, 501 A.2d at 460. The court found that that Berman was effectively the agent of and person behind the broker, such that Berman acted as both the lender and broker for the

23

transaction.  The court ultimately concluded that Berman charged a finder's fee for

introducing the borrower to himself in violation of both Maryland statutes

regulating brokers and lenders.  *Id.* at 463.  Notably, however, the court found that

*the only actionable fee was the $200 broker fee* that Berman charged for "finding"

himself; the court did not require that any other fees (out of a total of $1,229 fees

charged by Berman) be returned as finder's fees.  *See id.* at 459, 464.  As the court

stated:

> If the question were then asked, who on behalf of Mortgage Masters
> *did* do something to earn a finder's fee, the answer would have to be
> either "no one" or "Morris S. Berman."  Whatever services Mrs.
> Berman [broker] may otherwise perform for Mortgage Masters, it is
> clear beyond contradiction that, in this case, she performed none, and
> that Mr. Berman, using Mortgage Masters as a conduit, *extracted a
> finder's fee for doing no more than receiving appellants' application
> and passing it from one of his hands to the other.*

*Id.* at 463 (emphasis added).  Thus, Berman violated both the FFA and MD. CODE,

COM. LAW §§ 12-405 and 12-406 by charging the plaintiffs a $200 "broker fee" for

doing nothing but referring the loan to himself.[6]

---

[6]    Plaintiffs have cited an August 5, 2005 Advisory Notice issued by the
Commissioner of Financial Regulation for the proposition that every fee received
by a mortgage broker is a "finder's fee."  [D.E. 380-1].  Plaintiffs, however, not
only ignore the exclusion from the FFA of any entity that is identified as the lender
in the loan documents, they also ignore the language in the Advisory that rebuts
their assertion that all monies retained by a broker in violation of the Finder's Fee
Law are subject to a refund.  The Advisory states:  "In enforcing the statute, the

In discussing the applicable provisions of the Maryland Commercial Law, the *Coner* court noted that the laws "if not actually part of the State usury law, are clearly akin to it. *They are intended to prohibit a lender from collecting more than the interest or other remuneration that the law allows by collecting as well a finder's fee for simply introducing himself to the borrower.*" 501 A.2d at 463 (emphasis in original). The District Court correctly applied this reasoning here, where Prosperity charged fees for the actual lender services required to make their mortgage loan.

Plaintiffs were never able to dispute that Prosperity's fees were reasonable compensation for actual lending services rendered. They were never able to explain how any part of Prosperity's compensation constituted a fee for Prosperity's services in "procuring" or "arranging" a loan from itself, rather than a fee for the services described. Therefore, as plaintiffs acknowledged, they had no evidence that Prosperity's fees were "a finder's fee for simply introducing [it]self to the borrower" rather than "remuneration that the law allows." *Coner*, 501 A.2d at 463.

---

Commissioner has required brokers to make a refund of all *or part* of their broker fee to affected consumers." [*Id.*] (emphasis added). The Commissioner's position is consistent with *Coner*. 501 A.2d at 459, 464.

In applying the FFA to the record before it, the District Court properly looked to whether plaintiffs could show that Prosperity charged any "redundant and excessive fees," as opposed to fees for lender services actually provided. Plaintiffs conceded they could not. Their attempt to avoid making that showing – *i.e.*, to recover *all* fees that Prosperity received in connection with their loan and then trebling that amount – would be flatly inconsistent with the term "finder's fee," the statutory definition of that term, and the legislative intent as recognized by Maryland case law.[7] For these reasons, the District Court correctly interpreted and applied the meaning of "finder's fee" under the FFA and entered judgment in defendants' favor.

### 2. As an alternative ground for affirmance, the plain language of the FFA does not apply to Prosperity because it is identified as the lender in the loan documents

The plain language of the FFA also provides another, independent basis for affirmance of the judgment for Prosperity on the FFA claim. The FFA expressly

---

[7]     Plaintiffs assert that "[i]f finder's fees are limited to redundant and excessive fees, then as long as a broker *labels* its fees as being for services rendered" the broker could conceal the charge of finder's fees. App. Brief at 20 (emphasis added). But that is not what occurred here. Plaintiffs do *not* dispute that Prosperity provided services for which it charged $1,290, and there was no other lender that provided or charged for the same services. Thus, no "labeling" occurred here. And none of the fees was unreasonable or excessive in a way that could have concealed the charge of finder's fees within another line item.

26

excludes from its definition of "mortgage broker" a person who is "named as a lender in the agreement, note, deed of trust, or other evidence of the indebtedness." FFA § 12-801(e); MD. CODE, FIN. INST. §§ 11-501(i)(2); COMAR 09.03.06.02(B)(6).  Here, there is no dispute that Prosperity was identified as the lender in plaintiffs' Note and Deed of Trust.  [D.E. 28-6, Exs. 1-2 thereto]. Prosperity thus falls outside the FFA's definition of mortgage broker.  *See Project Vote/Voting for Am., Inc. v. Long*, 682 F.3d 331, 335 (4th Cir. 2012) ("[W]hen the words of a statute are unambiguous, ... this first canon is also the last [and] judicial inquiry is complete.") (citations omitted); *People's Ins. Counsel Div.*, 969 A.2d at 980.

In its February 2009 decision, however, the District Court stated that defendants' interpretation of the FFA "runs counter to the plain language of the [FFA] and would render a portion of the Act meaningless."  [D.E. 49 at 7] (emphasis added).  According to the District Court:

> Plaintiffs' Complaint alleges that Prosperity acted simultaneously as both a mortgage broker and a nominal mortgage lender, and collected fees for both.  Under § 12-804(e) of the Finder's Fee Act, a "mortgage broker may not charge a finder's fee in any transaction in which the mortgage broker … is the lender …."  The plain language of the statute clearly contemplates a situation where a mortgage broker acts as a mortgage lender.  What it forbids, on the other hand, is the collection of a fee by someone acting as both broker and lender.

27

[*Id.* at 7-8] (citing *Jones*). The District Court concluded that plaintiffs had sufficiently alleged – not proved – that Prosperity acted as both broker and lender and charged a "finder's fee" for finding itself. The District Court misinterpreted the FFA on this question, and its decision not to apply the plain meaning of the statute is a further basis for affirming judgment for Prosperity on the FFA claim.

J. Steven Lovejoy, the former Maryland Assistant Attorney General, provided a factual summary of the underlying intent of the applicable FFA regulations in testimony he gave in a different FFA case brought by plaintiffs' counsel. Mr. Lovejoy helped draft the regulations and served as advice counsel to the Division of Financial Regulation of the Maryland Department of Licensing and Regulation. Mr. Lovejoy's affidavit in *Jones* confirmed that:

- The Maryland Commissioner of Financial Regulation (later reinforced by the Legislature) made a conscious decision to adopt a clear, easily understood and easily complied-with test for determining whether an originator was acting as a broker or lender in a given transaction.
- "[I]f the originator's name is on the loan documents as lender, the originator is conclusively the lender, not a broker, for purposes of Maryland law. The source of the funds and the conduit through which the funds arrive at settlement simply do not matter for purposes of Maryland law."
- The state regulators deliberately rejected HUD's concept of "table-funding" as a method of defining mortgage brokers.

[D.E. 328-1 ¶¶ 17-22].

28

George Kinsel, former Director of Compliance Examinations for the
Maryland Department of Labor, Licensing and Regulation, in the OCFR, provided
testimony in the same case via an affidavit and a deposition.  [D.E. 328-2; D.E.
328-3].  Mr. Kinsel's testimony established that the OCFR did not consider the
fees "collected by originators in table-funded loans ... to constitute the type of
additional, improper 'finder's fee' prohibited by the [FFA]."  [D.E. 328-2 ¶ 6].

Maryland law clearly distinguishes between mortgage brokers and mortgage
lenders.  COMAR 09.03.06.02(B)(6); *see also* [D.E. 328-1 ¶¶ 20-21].  Table-
funding has never been illegal under Maryland law, and there is no language in the
FFA or COMAR stating that their definitions of "broker" and "lender" must be
disregarded where a transaction is table-funded.  Indeed, when the FFA was
enacted in 1979, the concept of table-funding, introduced under RESPA in 1996,
did not even exist.  Further, under plaintiffs' interpretation of the FFA (adopted by
the District Court), the court could not distinguish between a broker and a lender in
a table-funded transaction for purposes of applying the FFA.  The plain language
of the FFA, however, provides a clear and simple test for distinguishing between a
broker and a lender – by defining the lender as the entity identified as such in the
loan documents – and it is the only common-sense approach to follow.

29

**B.    Plaintiffs' FFA Claims Are Precluded By The *Minter* Verdict; Plaintiffs Are Judicially Estopped From Asserting That The <u>Verdict Does Not Apply To All Class Members</u>**

**1.    The *Minter* verdict bars plaintiffs' claims**

In *Minter*, the jury determined that Prosperity did not refer any loans to Wells Fargo and thus was acting as a lender, not a broker as plaintiffs contended. Plaintiffs are precluded from relitigating that issue.  *See* [*Minter* D.E. 615 at 2].

Issue preclusion "forecloses the relitigation of issues of fact or law that are identical to issues which have been actually determined and necessarily decided in prior litigation in which the party against whom [issue preclusion] is asserted had a full and fair opportunity to litigate."  *In re Microsoft Corp. Antitrust Litig.,* 355 F.3d 322, 326 (4th Cir. 2004) (internal quotation omitted).  Issue preclusion applies where "(1) the issue or fact is identical to the one previously litigated; (2) the issue or fact was actually resolved in the prior proceeding; (3) the issue or fact was critical and necessary to the judgment in the prior proceeding; (4) the judgment in the prior proceeding is final and valid; and (5) the party to be foreclosed by the prior resolution of the issue or fact had a full and fair opportunity to litigate the issue or fact in the prior proceeding."  *Id.* at 326.  Each of these elements is satisfied here.

<u>First</u>, the underlying factual question is identical.  In both *Petry* and *Minter*,

the claims rested on the central assertion that Prosperity "brokered loans to Wells

Fargo," which was the *Minter* plaintiffs' basis for previously seeking collateral

estoppel between *Minter* and *Petry*.  [*Minter* D.E. 415 at 3].  In *Minter*,

Prosperity's broker status was essential to prove plaintiffs' theory that Prosperity

failed to adequately disclose its affiliated business arrangement ("ABA") with

Wells Fargo, one of its 50% owners, a purported automatic violation of Section 8

of RESPA, 12 U.S.C. § 2607.  This theory was explained in the *Minter* Jury

Instructions as follows:

> Plaintiffs allege that Prosperity Mortgage Company and Wells Fargo
> Bank were parties to an Affiliated Business Arrangement  and that
> Prosperity Mortgage Company violated RESPA in connection with
> the Minter and Alborough loans *by its referral of the plaintiffs' loans
> to Wells Fargo Bank as the actual lender without disclosing to the
> plaintiffs its true relationship as a referring broker and to Wells
> Fargo Bank as the real lender.*

[*Minter* Day 17 Transcript at 30:22-31:4] (emphasis added).[8]  In explaining the

meaning of an ABA, the District Court noted the critical question for the jury to

determine was whether "Prosperity [as an alleged broker] referred or affirmatively

---

[8]     Plaintiffs' claim that Prosperity was a "sham" ABA was also predicated on
their theory that Prosperity served as plaintiffs' mortgage broker rather than their
lender.  *See, e.g.,* [*Minter* Day 16 Transcript at 191:9-12] (arguing, in closing,
"What Wells Fargo did not tell the Plaintiffs, what Prosperity did not tell them, and
what Long & Foster did not tell them is of Prosperity's role as a broker, as a
broker, that's all it was.  They didn't tell them it was a sham.").

influenced the Plaintiffs to use Wells Fargo for the provision of settlement services." [*Id.* at 32:16-18]. The question was stated in the *Minter* verdict form as follows: "Have Plaintiffs proved, by a preponderance of the evidence, that Prosperity Mortgage Company referred or affirmatively influenced the Plaintiffs to use Wells Fargo Bank, N.A. for the provision of settlement services?" *See* [*Minter* D.E. 615 at 2]. The jury answered "No." *See* [*id.*].

That Prosperity did not refer loans to Wells Fargo means that Prosperity did not broker loans to Wells Fargo. This question resolves plaintiffs' FFA claims in defendants favor, because it answers a threshold question of liability under the FFA. In fact, plaintiffs in *Minter* have not appealed the question of whether Prosperity referred settlement service business to Wells Fargo. Indeed, before the *Minter* trial, when the *Petry* case was anticipated to be tried first, the *Minter* class (represented by the same counsel) sought to utilize what it anticipated would be a verdict in *Petry* that Prosperity was a broker to seek an award of judgment on that same issue in *Minter*. [*Minter* D.E. 415 at 3-4; *Minter* D.E. 415-1 at 11-12]. Thus, plaintiffs' counsel certainly viewed that factual issue as the same in both cases.

Second, the *Minter* jury "actually resolved" the question, correctly concluding that Prosperity did not refer loans to Wells Fargo. [*Minter* D.E. 615]. This conclusion squarely rejected plaintiffs' numerous contrary arguments. *See*

32

[*Minter* Day 16 Transcript at 14:1-2] (Denise Minter's Prosperity loan "was really a Wells Fargo loan"); [*id.* at 15:11-14] ("Prosperity was merely a [mortgage] broker [] created by Long & Foster and Wells Fargo to facilitate referrals of mortgage business to Wells Fargo"); [*id.* at 15:16-19] ("Wells Fargo and Long & Foster created Prosperity ... to hide the fact that Prosperity really was nothing more than Wells Fargo's mortgage broker").  Plaintiffs' counsel also expressly informed the jury that the "broker claim" was comprised of "questions 3, 4, and 5 on the *Minter* verdict form."  [*Id.* at 36:8-11].  Furthermore, the plaintiffs maintained – and the jury was instructed – that their claims were predicated on the existence of "ABAs" among the defendants.  *See* [*Minter* Day 17 Transcript at 31:15-17].

In *Minter*, plaintiffs have taken the position that the jury never reached the broker question because it did not answer Question 5 (whether plaintiffs proved that Prosperity's loans were table-funded and whether defendants followed ABA disclosure requirements).  But the only reason the jury did not reach Question 5 was that it had already determined that Prosperity did not refer the plaintiffs to use Wells Fargo Bank for settlement services, which Prosperity would have had to do if it was brokering the plaintiffs' loans.  Indeed, the Special Verdict form specifically stated that the jury should not answer Questions 5 or 6 if its response

33

to Question 4 was "No."  [*Minter* D.E. 615 at 2].  Thus, the jury rejected plaintiffs'

mortgage broker claim and arguments about broker referrals at the outset.[9]

Third, Prosperity's status as a broker was not merely "incidental" to the

*Minter* judgment.  Rather, as the foregoing discussion and review of the jury

instructions and Special Verdict form make clear, it was the lynchpin of plaintiffs'

ABA broker/disclosure claim.

Fourth, the judgment in *Minter* is final and binding for the purposes of issue

preclusion.  The Supreme Court has held that a final judgment of a district court is

conclusive, for purposes of the broader concept of "res judicata," until (and unless)

it is modified or reversed.  *Deposit Bank of Frankfort v. Bd. of Councilmen,* 191

U.S. 499, 514 (1903).  If there is an appeal, "the established rule in the federal

courts [is] that a final judgment retains all of its res judicata consequences pending

decision of the appeal."  *Pharmacia & Upjohn Co. v. Mylan Pharm., Inc.,* 170 F.3d

1373, 1381 (Fed. Cir. 1999) (quoting *Warwick Corp. v. Md. Dept. of Transp.,* 573

F. Supp. 1011, 1014 (D. Md. 1983), *aff'd,* 735 F.2d 1359 (4th Cir. 1984) (mem.)).

Fifth, a significant number of *Petry* class members also belong to the

certified class in *Minter*.  At a minimum, this segment of the *Petry* class had a full

---

[9]     Of course, the jury's response to Question 1– to the effect that Prosperity
was not a sham – also rejected plaintiffs' mortgage broker arguments.  *See supra*
n.8.

opportunity to litigate whether Prosperity was a mortgage broker: *it was a central issue of plaintiffs' claims in both cases, it was litigated by the same class counsel, and they had weeks of trial to fully present their case*.

In fact, the entire *Petry* class should be considered to be in privity with the *Minter* class because both classes have the same interest in proving that Prosperity was a mortgage broker rather than a mortgage lender. Indeed, this Court has held that even where the makeup of a class changes between two suits due to the passage of time, where the two classes have the same interest and sufficient privity, principles of collateral estoppel still apply. *See Riddick by Riddick v. Sch. Bd. of City of Norfolk*, 784 F.2d 521, 532 (4th Cir. 1986) (finding privity between two different classes of plaintiffs contesting similar school desegregation issues); *see also Sondel v. Northwest Airlines, Inc.*, 56 F.3d 934, 939, 940 (8th Cir. 1995) ("it is significant [to whether privity exists] that the same attorneys who represented the [prior] plaintiffs are the class counsel in the federal class action" and that the current class was in privity with the prior class where "although different remedies were available [to the current class], the substantive right remained the same [as those asserted in the prior class]"); *Bell v. Bd. of Educ., Akron Pub. Sch.*, 683 F.2d 963, 966 (6th Cir. 1982) (collateral estoppel applied to preclude claims of later class action with different class members where (1) there was no showing that

35

named plaintiffs in prior action failed to adequately represent the class; (2) there

had been no significant change in the law since the prior class action; and (3) the

"interests of the [prior] class and the instant class are the same").  These factors

counsel in favor of finding privity here, and the *Petry* class should be barred by

issue preclusion from relitigating Prosperity's status as a broker.

### 2.    The class is judicially estopped from pursuing its FFA claims

Even if complete privity does not exist between the classes, plaintiffs and

other *Petry* class members who are not in the *Minter* class are judicially estopped

from now separating themselves from their fellow class members.  Plaintiffs

persuaded the District Court that all of their FFA claims should be resolved on a

class, not an individualized, basis because Prosperity's status as a broker would not

vary transaction-by-transaction, *i.e.*, resolving whether Prosperity was a broker for

plaintiffs' loan transaction would resolve the issue for *each* class member's claim.

[D.E. 186 at 74-76].  The doctrine of judicial estoppel forecloses plaintiffs from

now taking the inconsistent position in this Court that certain of the *Petry* class

36

members (*i.e.*, those who are not in the *Minter* class) are entitled to pursue a

*different* answer as to whether Prosperity was a broker in *their* transactions.[10]

There are four elements necessary for judicial estoppel to apply:

> (1) the party to be estopped must be advancing an
> assertion that is inconsistent with a position taken during
> previous litigation; (2) the position must be one of fact
> instead of law; (3) the prior position must have been
> accepted by the court in the first proceeding; and (4) the
> party to be estopped must have acted intentionally, not
> inadvertently.

*Folio v. City of Clarksburg*, 134 F.3d 1211, 1217-18 (4th Cir. 1998) (internal

citation omitted).  Plaintiffs' position – that all of their claims rise and fall together

on the broker question – satisfies each of these elements.

First, any attempt by plaintiffs to now assert that only some portion of the

class is bound by the *Minter* judgment would be inconsistent with their

longstanding view that the broker question would be resolved in one stroke for all

or for none.  If a jury has already concluded that Prosperity did not refer loans to

Wells Fargo as a broker for a significant segment of the class, then there is no

ability (consistent with the very predicate for class certification here, argued by

---

[10]    With respect to the application of judicial estoppel where a plaintiff seeks to
pursue inconsistent positions on appeal, it is sometimes referred to as waiver,
rather than judicial estoppel.  *Beddall v. State St. Bank & Trust Co.,* 137 F.3d 12,
23-24 (1st Cir. 1998).

plaintiffs and adopted by the Court) to reach a *different* result for the remainder of the class.

Second, plaintiffs' class certification position was one of *fact*. Plaintiffs argued that Prosperity's conduct and the facts surrounding the origination and funding of the loans would be identical for each class member. While plaintiffs may have argued that this fact had legal significance for class certification, it was at bottom a *factual* argument that broker status would be shown by common evidence. Indeed, early in the case, the District Court found that "[w]hether Prosperity is a creditor or broker is a question of fact." [D.E. 49 at 11 n.4].

Third, plaintiffs' position was adopted by the District Court, which agreed that the referral/broker question could be answered for the entire class as a whole, without a need to consider Prosperity's status in each transaction. [D.E. 186 at 67].[11]

Fourth, plaintiffs' class certification position was a deliberate strategy. Plaintiffs clearly believed that the only way to obtain class certification was to take the position that Prosperity's status and conduct were identical in each transaction; they chose and aggressively pursued that position.

_____

[11]    That defendants have opposed, and do not agree with, the certification premise of the *Petry* class is of no moment given that defendants did not prevail on that issue below.

38

Plaintiffs chose to bind the class members' fates together on the issue of Prosperity's broker status; the class members' FFA claims must rise and fall together. The *Minter* verdict means that the FFA claims for all *Petry* class members who overlap or who are in privity with the *Minter* class already have fallen. The balance of the *Petry* class, if any, must suffer the same fate, and the judgment on the FFA claims can be affirmed on this alternative basis.

### C.    The District Court Correctly Held That Aider And Abettor Liability Does Not Apply To Claims Under The Finder's Fee Act

The District Court properly determined that aiding and abetting liability is inconsistent with the FFA's narrow statutory and remedial scheme. In reaching its conclusion, the District Court appropriately considered Maryland cases and the U.S. Supreme Court's decision in *Central Bank of Denver v. First Interstate Bank*, 511 U.S. 164 (1994). In *Central Bank*, the Supreme Court determined that aiding and abetting liability is not available under Section 10(b) of the Securities Exchange Act of 1934 predominantly because (a) the language in Section 10(b) does not mention aiding and abetting, and (b) Congress knew how to impose

39

aiding and abetting liability, as evidenced by other statutes explicitly providing for such, and chose not to do so.  *Id.* at 175.[12]

The District Court correctly noted that Maryland courts have not extended the scope of aiding and abetting liability to statutes providing for civil liability where the statute does not expressly impose aiding and abetting liability.  *Central Bank's* reasoning supports this conclusion here.  A finding that the statutory language of the FFA does not provide for aiding and abetting liability, and thus that no such liability can be implied, is consistent with basic principles of statutory interpretation under Maryland law.  When interpreting statutes, the Maryland Court of Appeals has made clear that the inquiry "begins, and usually ends, with the words of the statute at issue" and that a court "may not insert" terms to make the statute express an intention "not reflected in the statute's original form."

---

[12]    Plaintiffs attempt to dismiss *Central Bank* as applicable to federal cases only.  But Maryland courts have long looked to federal decisions "for persuasive guidance interpreting" Maryland statutes.  *Davis v. State*, 43 A.3d 1044, 1051 (Md. 2012).  Moreover, as discussed below, several state courts and at least one United States Court of Appeals have found the reasoning of *Central Bank* persuasive in finding that there is no aiding and abetting liability available under a relevant state statute.  Plaintiffs cite *Teague* as dismissing the applicability of *Central Bank* to questions of state law, but – quite to the contrary – *Teague* found that *Central Bank* was "persuasive" and applied it to conclude that aiding and abetting liability did *not* exist under the statute at issue.  *Teague v. Bakker*, 35 F.3d 978, 992 (4th Cir. 1994).

*Marriott Emples. Fed. Credit Union v. Motor Vehicle Admin.*, 697 A.2d 455, 458

(Md. 1997) (internal citations omitted).

The District Court's application of *Central Bank* to the FFA is consistent

with decisions both inside and outside of Maryland. For instance, in *Eastside Vend

Distributors v. Coca-Cola, Enterprises,* the Maryland court did not impose aiding

and abetting liability based upon the following: (a) the plain statutory language

made no explicit reference to aiding and abetting; (b) the legislature could have

imposed such liability but chose not to do so, as partially evidenced by its inclusion

of explicit conspiracy liability language in the statute; and (c) Maryland had not

enacted a general aiding and abetting statute, and therefore there was no general

presumption that the plaintiff may sue aiders/abettors. 2006 WL 1516012, at *4-7

(Cir. Ct. Balt. City May 8, 2006); *see also Kramer v. Perez*, 595 F.3d 825, 830 (8th

Cir. 2010) (refusing to recognize aiding and abetting liability where not in text of

statute). And, of course, the Maryland Legislature knows how to directly provide

for aider and abetting liability when it wants to. *See, e.g.,* MD. CODE, STATE GOV'T

§ 20-101(d)(6); *id.* § 20-801(1); MD. CODE, NAT. RES. § 5-409(a).

Ignoring the import of *Central Bank*, plaintiffs claim that Maryland

recognizes aiding and abetting liability for *any* unlawful act, including a statutory

violation, but the cases they cite do not support their argument. For example, in

41

*Consumer Protection Division v. Morgan*, 874 A.2d 919 (Md. 2005), the Maryland Court of Appeals did not consider the availability of, or apply, aiding and abetting liability under a state statute. The court found that the parties who acted in concert with one another – assisting one another's *individual violations* – could be held jointly and severally liable, but that is not the issue here. *Id.* at 954.

Likewise, *Alleco Inc. v. Harry & Jeanette Weinberg Found., Inc.* also did not consider whether aider and abettor liability is available for statutory violations, but rather recognized only the availability of aider and abettor liability "for various underlying torts." 665 A.2d 1038, 1049-50 (Md. 1995). *Alleco* did not hold, as plaintiffs assert, that aiding and abetting liability exists for "*any* unlawful act." Indeed, nowhere in *Alleco* – or in any non-Maryland case cited by *Alleco* – did the court purport to state the law in Maryland as to the availability of aiding and abetting liability as related to a violation of any Maryland statute.

Plaintiffs advance a secondary argument that aiding and abetting liability is available for violations of statutes that "sound in tort." However, even if a statute may sound in tort, it does not follow that aiding and abetting liability is available. Additionally, almost all of the cases cited by plaintiffs for this argument relate to categories of liability that have nothing to do with this case, including conduct resulting in personal injury or death and officer and director liability. *See, e.g.,*

42

*Green v. N.B.S., Inc*., 952 A.2d 364, 377 (Md. Ct. Spec. App. 2008) (statute was

not limited to actions based on conduct that constituted torts at common law);

*Hartford Accident & Indem. Co. v. Scarlett Harbor Assocs*., 674 A.2d 106, 129

(Md. Ct. Spec. App. 1996) (violation of the Consumer Protection Act is

comparable to tort for purpose of holding partners liable for tortious acts of

partnership).[13]

    *Jones v. Nationscredit Financial Services Corp.*, No. 24-C-02-000572 (Cir.

Cit. Balt. City Aug. 9, 2005) (attached to Appellant's Brief), is the only Maryland

case cited by plaintiffs that applied aiding and abetting liability under a statute (the

---

[13]    Other states *have* considered the precise issue of whether tort principles may apply to create aider and abettor liability under a state statute, and those courts have refused to apply tort law in this way. *Sell v. Gama*, 294 P.3d 421, 427 (Ariz. 2013) ("[I]t would be inappropriate to anchor a finding of aiding and abetting liability under the Arizona Securities Act on common law tort principles."); *N. Star Int'l Trucks, Inc. v. Navistar, Inc.*, 2010 Minn. Dist. LEXIS 266, at *42 (Minn. Dist. Ct. June 30, 2010) ("[That] the legislature included aiding and abetting language in [other] statutes reflects its understanding that there is no general common law aiding and abetting liability for violations of civil statutes."). Likewise, plaintiffs' analogies to criminal law are of no force. *Rice v. Paladin Enters.*, 128 F.3d 233, 251 (4th Cir. 1997), and *Kohler v. State*, 36 A.3d 1013 (Md. Ct. Spec. App. 2012), each discuss liability for aiding and abetting crimes resulting in death. To the extent the elements of criminal aiding and abetting are similar to the elements of civil aiding and abetting, this has nothing to do with whether the latter is available under the FFA.

43

FFA) that does not provide for it.[14]  However, *Jones* is an unpublished decision that is not precedential, and it is erroneous.  The court, with no analysis, simply assumed that because aiding and abetting liability had been applied in the context of tort liability, it was available under the FFA.  The *Jones* court's decision to go beyond the text of the FFA to impose aider and abettor liability is inconsistent with both Maryland and Supreme Court law discussed above.  The proper approach is to do exactly what the District Court did here: refrain from imposing aiding and abetting liability unless the plain language of the statute (or other indicia) demonstrates a clear legislative intent to do so.

### D. Ample Grounds Exist To Affirm The District Court's Ruling That Long & Foster And Wells Fargo Could Not Be Held Liable For Conspiracy To Violate The FFA

In dismissing plaintiffs' conspiracy claim, the District Court correctly applied *Shenker*, which held that "a defendant may not be adjudged liable for civil conspiracy unless that defendant was *legally capable* of committing the underlying tort alleged."  983 A.2d at 428-29 (emphasis added).  At issue in *Shenker* was the

---

[14]    *T-Up, Inc. v. Consumer Prot. Div.*, 801 A.2d 173, 199 (Md. Ct. Spec. App. 2002), *Cent. Collection Unit v. Kossol*, 771 A.2d 501, 507 (Md. Ct. Spec. App. 2001), and *MaryCLE, LLC v. First Choice Internet, Inc.*, 890 A.2d 818, 846-47 (Md. Ct. Spec. App. 2006), merely examined situations where corporate officers and agents may be liable for the wrongs of their companies; none of them considered the liability of an officer or agent as an aider or abettor.

44

cash-out merger of a Maryland corporation carried out by two directors/majority shareholders and various private investors. The shareholders claimed that the board breached its fiduciary duties to them by failing to obtain an appropriate price for the cashed-out shares and that the board and the private investors conspired to breach those duties. The court held that because the investors owed no fiduciary duty to the shareholders, they could not be liable for conspiracy and affirmed dismissal of that claim. Applying *Shenker*, the District Court properly held that, because neither Long & Foster nor Wells Fargo functioned as a mortgage broker in the transactions at issue in this case, they were not capable of violating the FFA and, consequently, could not be liable as conspirators.

Plaintiffs contend that the District Court's interpretation of *Shenker* represents a radical departure from precedent that holds non-direct perpetrators responsible for conspiracy. In another FFA case brought by the same plaintiffs' counsel, the District Court recently rejected precisely this "straw man" argument. In *Lombel v. Flagstar Bank, F.S.B.*, 2013 U.S. Dist. LEXIS 147193 (D. Md. Oct. 11, 2013), the court dismissed the plaintiffs' conspiracy claim and concluded that "this attempt to pull up Plaintiffs' conspiracy claim by its own bootstraps amounts to little more than sophistry; *Shenker* makes clear that the crucial question for civil conspiracy liability is whether a defendant could be subject to liability had he

committed the underlying action, not whether he committed that action." *Id*. at *14-15 (citing *Shenker*, 983 A.2d at 428).

Thus, *Shenker* simply added the requirement that any non-direct perpetrator must have the legal capacity to commit the underlying wrongful act. The "legally capable" requirement means that the plaintiff must assert that the alleged conspirator owes a duty to the plaintiff recognized by law and could be subject to liability for breach of that duty.[15] *See BEP, Inc. v. Atkinson,* 174 F. Supp. 2d 400 (D. Md. 2001) (high level management employee could be liable for breach of fiduciary duty, but the manager's wife owed no fiduciary duty to the plaintiff, and thus could not be a conspirator, given her employment position).

This reasoning applies perfectly here. As noted, the FFA "is very narrow in its scope: it applies only to mortgage brokers and the fees they charge borrowers."

_____

[15]    In Maryland, civil conspiracy is a derivative action that requires an underlying tortious injury to maintain a claim. *See Alleco*, 665 A.2d at 1045. If civil conspiracy is proved, it imposes joint and several liability upon each conspirator for all harm committed pursuant to the conspiracy. *Alleco, Inc. v. Harry & Jeanette Weinberg Found., Inc.*, 639 A.2d 173, 179 (Md. Ct. Spec. App. 1994). A foundational principle of tort law is that liability requires a breach of some duty owed to the plaintiff. *See West Virginia C. & P. R. Co. v. State*, 54 A. 669, 671-72 (Md. 1903) ("[T]here can be no negligence where there is no duty that is due; for negligence is the breach of some duty that one person owes to another."). Against this backdrop, it follows that a defendant cannot be held liable under a conspiracy theory that is derivative of an underlying duty that the defendant does not owe to the plaintiff, and this is precisely what *Shenker* held.

46

*Sweeney*, 879 A.2d at 1048-49. Plaintiffs must concede that neither Long & Foster nor Wells Fargo owed any duties to class members under the FFA, and there are certainly no such allegations in the case.[16] Rather, plaintiffs rely solely on Long & Foster's and Wells Fargo's participation in the alleged "conspiracy," but this is legally insufficient. *See Paccar Inc. v. Elliot Wilson Capitol Trucks LLC*, 905 F. Supp. 2d 675, 696 (D. Md. 2012); *see also In re Hoang*, 2012 WL 195316, at *4 (Bankr. D. Md. Jan. 23, 2012) (mere participation in the agreement underlying the injury cannot impose civil conspiracy liability if the participant was not personally bound by the "duty violated by the wrongdoing") (citing *BEP*, 174 F. Supp. 2d at 409) *reversed on other grounds by In re Hoang*, 2013 WL 1105021 (D. Md. Mar. 15, 2013).

Here, the FFA governs broker conduct, and its damages provision provides only for damages that must be forfeited by "any mortgage broker," and does not provide damages for any other entity. FFA § 12-807. Like the defendant employer in *Manikhi v. Mass Transit Admin.,* 758 A.2d 95 110 (Md. 2000), which, as a state agency, was not a "person" and thus could not be liable under 42 U.S.C.

---

[16]    In fact, the plaintiffs originally asserted a theory that Long & Foster, a real estate broker, also operated as a mortgage broker, and the District Court properly dismissed that claim, observing that there were no allegations that Long & Foster "performed the services of a mortgage broker." [D.E. 49 at 12].

§ 1983, Wells Fargo and Long & Foster could not be liable for damages under the FFA if they were the only defendants in the case, as plaintiffs have not alleged that they acted as mortgage brokers in any of the transactions at issue in this case, nor could they have done so.[17]

Plaintiffs attempt to escape the force of *Shenker* by arguing that Long & Foster and Wells Fargo are *hypothetically* capable of being mortgage brokers under the FFA and, thus, could always be held liable for conspiracy to violate that law. This is simply not the law. For example, in *Paccar*, the dealer who was alleged to be a co-conspirator likely could be subject to the Maryland dealerships statutes at issue in another context; however, the relevant analysis was whether that dealer owed any statutory duties to the plaintiff *in that case*. 905 F. Supp. 2d at 669.[18]

---

[17]    The cases cited by plaintiffs do not compel a different result. In *Etgen v. Washington County Bldg. & Loan Ass'n*, 41 A.2d 290, 291-92 (Md. 1945), the alleged conspirators each were legally capable, on their own, of committing the underlying fraud against the corporation. The other cases plaintiffs cite are equally unavailing. In *Mackey v. Compass Marketing, Inc*., 892 A.2d 479 (Md. Ct. Spec. App. 2006), where the court examined jurisdiction based on a conspiracy theory, there was no indication that any defendant lacked the capacity to engage in the conduct alleged.

[18]    Hypothetical legal capacity also would be inconsistent with the so-called "intracorporate conspiracy doctrine," which, for example, examines the *actual* role of a corporation's employees and whether they acted outside the scope of their employment, not simply whether they hypothetically could have done so. *See, e.g., McHugh v. Mayor*, 2011 WL 1135853, at *11 n.15 (D. Md. Mar. 24, 2011); *see also Wasserman v. Kay*, 14 A.3d 1193, 1221 n.14 (Md. Ct. Spec. App. 2011).

Here, the District Court correctly recognized that hypothetical capacity was not sufficient and looked to the roles of Long & Foster and Wells Fargo with regards to the transaction at issue. The court explained that, "[b]ecause neither Long & Foster nor Wells Fargo are alleged to function as mortgage brokers in the transactions at issue in this action…they are not capable of violating the FFA directly and thus, cannot be liable for conspiracy to violate that statute." [D.E. 348 at 49]. It cogently explained as follows:

> [The hypothetical capacity] argument misses the point of *Shenker*. While the dismissed defendant in *Shenker* certainly could be [] a fiduciary in some other context, what mattered was the fiduciary relationship that was allegedly breached in the action before the court. That Long & Foster or Wells Fargo are hypothetically capable of functioning as mortgage brokers in some other context, does not render them capable of committing the tort that is underlying the conspiracy claims alleged in Petry.

[*Id.* at 50]. This analysis and holding properly applied *Shenker* and were consistent with case law, including *BEP*, *In re Hoang*, *Paccar*, *Manikhi*, *Eastside Vend Distributers*, and *Wasserman*, cited *supra*.[19]

---

[19]    Significantly, the *Petry* decision does not stand alone. The District Court expressly followed Judge Nickerson's application of *Shenker* in *Petry* in two other finder's fee cases, *Marshall v. James B. Nutter & Co.*, 2013 WL 3353475, at *4-5 (D. Md. July 2, 2013) (Bennett, J.); and *Lombel, F.S.B.*, 2013 U.S. Dist. LEXIS 147193, at *14-15 (Grimm, J.).

49

Finally, an alternate ground to affirm the District Court's decision is that there is no conspiracy liability under the FFA, just as there is no aiding and abetting liability under the Act. As this Court has held, "[t]he rationale of *Central Bank* with respect to aiding and abetting applies equally to civil conspiracy." *Glaser v. Enzo Biochem*, Inc., 126 Fed. App'x. 593, 599 (4th Cir. 2005). Thus, federal courts have extended the analysis in *Central Bank* "to reject attempts to assert conspiracy claims where the statute at issue is silent as to conspiracy liability." [D.E. 348 at 40-45] (collecting cases and holding that claim of conspiracy to violate RESPA was inconsistent with that statutory scheme). The District Court's dismissal of plaintiffs' conspiracy to violate the FFA claims should be affirmed.

## VII.   ARGUMENT IN SUPPORT OF CROSS-APPEAL

Defendants are cross-appealing on a *conditional* basis. Therefore, defendants request that the issues below be resolved *only if* the Court finds in plaintiffs' favor on any of the issues plaintiffs appeal or otherwise reverses or vacates the District Court's final judgment. *See, e.g.*, *Hatfill v. The N.Y. Times Co.*, 532 F.3d 312, 315 (4th Cir. 2008).

50

## A.    The District Court Erred In Certifying The Class

The District Court erroneously allowed this case to go forward as a class action covering every Maryland customer in Prosperity's history – nearly 60,000 loans over 19 years.  This occurred by misapplying the Rule 23 standard, selecting an incorrect 12-year limitations period, and including even time-barred claims based on a flawed theory of classwide equitable tolling.

### 1.    Standard of Review

This Court reviews the District Court's class-certification decision for abuse of discretion, "but the district court must exercise its discretion within the confines of Federal Rule of Civil Procedure 23."  *Doe v. Chao*, 306 F.3d 170, 183 (4th Cir. 2002), *aff'd on other grounds*, 540 U.S. 614 (2004).  "A district court *per se* abuses its discretion when it makes an error of law or clearly errs in its factual findings."  *Thorn v. Jefferson-Pilot Life Ins. Co.*, 445 F.3d 311, 317 (4th Cir. 2006).  One such reversible error is "fail[ure] to look beyond the pleadings to understand the claims, defenses, relevant facts, and applicable substantive law in order to make a meaningful determination of whether the alleged questions of law are capable of classwide resolution."  *M.D. v. Perry*, 675 F.3d 832, 842 (5th Cir. 2012).

51

### 2.    Under the correct interpretation of Rule 23, which is more than a mere pleading standard, plaintiffs' FFA claims satisfied neither commonality nor predominance

Rule 23(a)(2) requires a party seeking class certification to prove that the case involves questions that are "common to the class."  Instead of conducting the "rigorous analysis" that Rule 23 requires, *Thorn*, 445 F.3d at 318 (citation omitted), the District Court began and ended with the proposition that plaintiffs had *pleaded* that defendants' liability could be determined on a class-wide basis. Less than two months after the District Court's decision, the Supreme Court made clear that "Rule 23 does not set forth a mere pleading standard." *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (2011).  Because the District Court misapplied Rule 23, its decision to certify the class should be reversed.

Merely pressing a common allegation is not enough.  *See Wal-Mart*, 131 S. Ct. at 2551.  Rather, a plaintiff's "claims must depend upon a common contention . . . of such a nature that it is capable of classwide resolution." *Id.*  And the burden lies on the plaintiff, who must "*prove* that there are *in fact* . . . common questions." *Id.* (first emphasis added); *see also, e.g.*, *id.* at 2553 (requiring "significant proof" that the defendant in fact injured the plaintiff class in the same way).  Accordingly, "it may be necessary for the court to probe behind the pleadings before coming to rest on the certification question." *Id*. at 2551.

52

Here the District Court did no such probing.  Rather, it concluded that because "Plaintiffs *allege[d]*" that Prosperity loans were brokered, by virtue of table-funding, it did not need to conduct any additional analysis.  [D.E. 186 at 77] (emphasis added).  Moreover, the District Court did not consider how plaintiffs might prove that Prosperity charged a finder's fee in each class member's transaction.  Under the Court's ultimate ruling in the case, there was no common evidence by which plaintiffs could establish liability on this question.  The failure to rigorously analyze the method by which plaintiffs would have to prove their claims at trial is reason enough, standing alone, to reverse the certification order. *See, e.g.*, *Ealy v. Pinkerton Gov't Servs., Inc.,* 514 F. App'x 299, 306 (4th Cir. 2013).

If the District Court had "probe[d] behind the pleadings," it would have seen that plaintiffs could not have proven on a class basis that every (let alone any) Prosperity loan was table-funded and if so, that Prosperity charged a finder's fee. For example, whether a loan was "table-funded" depends on how it was funded and when and to whom it was assigned, and the record shows that Prosperity loans, like most lenders' loans, were neither funded nor assigned in a uniform way.  The record showed no way for plaintiffs to prove with classwide evidence that any

53

Prosperity loan, much less every Prosperity loan, involved a "contemporaneous" advance from, and assignment to, Wells Fargo.  24 C.F.R. § 3500.2(b).

For example, one-sixth of Prosperity's Maryland loans in the sample set were funded by Prosperity with Prosperity checks, not from the Wells Fargo warehouse line as the class definition required.  [D.E. 142 ¶ 8].  Likewise, many of the loans drawn from Prosperity's warehouse line of credit were assigned to investors other than Wells Fargo and could not possibly have been table-funded. *See* [D.E. 366-2] (examples of assignments made directly by Prosperity to investors other than Wells Fargo Bank); 24 C.F.R. § 3500.2(b) (table-funding requires "a contemporaneous advance of loan funds and an assignment to the person advancing the funds").  And those that were assigned to Wells Fargo were assigned at varying times, including times so long after closing as to fall outside any remotely coherent definition of "contemporaneous" assignment.  [D.E. 142 ¶ 10].

Given those differing circumstances, plaintiffs did not provide the District Court with any standard by which their table-funding theory could be resolved in their favor by common evidence.  Merely asserting that Prosperity's loans were "always" table-funded does not make it so.  Similarly, the District Court ultimately held that plaintiffs would have to prove that Prosperity charged a "redundant and

54

excessive" fee in each class member's transaction.  There was no common

evidence from which plaintiffs could prove their factually variegated claims, and

therefore they should not have been certified.

### 3. The District Court abused its discretion in certifying time-barred FFA claims

The class definition includes two quite different groups of borrowers:  those

with time-barred claims, who must rely on equitable tolling to proceed, and those

with timely claims, like plaintiffs.  Despite this divide, the District Court

incorrectly concluded that plaintiffs were typical of the entire class because, even

though time-barred class members need to show additional elements that plaintiffs

do not, those additional elements are "not inconsistent" with plaintiffs' claims.

[D.E. 186 at 75].  This Court has held squarely to the contrary.

Class members with time-barred claims must prove both fraudulent

concealment and individualized diligence to toll the statute of limitations.[20]  MD.

CODE, CTS. & JUD. PROC. § 5-203.  Timely plaintiffs need prove neither.  For that

reason, this Court has expressly held that class representatives with timely claims

---

[20]    Below, both parties relied on federal precedent in addressing the question of equitable tolling of the *Petry* state-law claims.  To the extent the parties have not stipulated away the issue, this Court's precedent indicates that Maryland law applies to the requirements for equitable tolling here.  *Wade v. Danek Med., Inc.*, 182 F.3d 281, 289 (4th Cir. 1999).

could not represent a class of borrowers with time-barred claims.  *See Doe*, 306 F.3d at 184.  In *Doe*, the plaintiffs (whose claims were timely) sought to certify a class including members whose claims were time-barred.  Lumping together such claims "undermines typicality," this Court explained, "because the claims of the named representatives would differ from those of unnamed class members with potentially time-barred claims."  *Id.*  This Court did not need to examine whether the claims were also "inconsistent," the test the District Court used here; what mattered was that the claims were "different."  *Accord, e.g.*, *Corley v. Entergy Corp.*, 220 F.R.D. 478, 484 n.3 (E.D. Tex. 2004); *Humphrey v. Int'l Paper*, 2003 WL 22111093, *18-19 (N.D. Ill. Sept. 11, 2003); *Daly v. Harris*, 209 F.R.D. 180, 197 (D. Haw. 2002).

Indeed, the District Court itself recognized this fundamental tenet elsewhere in the very same order.  [D.E. 186 at 55-56, 59].  As the court noted in *Minter*, there were "potentially dispositive differences" between tolling and time-barred claims and concluded that "the factual differences in Prosperity's operations and the need of some potential plaintiffs to prove elements required for equitably tolling raise questions regarding the typicality of the Named *Minter* Plaintiffs' causes of action" and necessitated, at a minimum, a separate class representative for borrowers with untimely claims.  [D.E. 186 at 55].  The District Court abused

56

its discretion by coming to an entirely different conclusion in *Petry* on indistinguishable facts, with no explanation for the differing results.

The District Court also erred in concluding that common questions as to the time-barred claims would predominate. By bringing time-barred claims into the class on a tolling theory, the District Court guaranteed that the collateral, individualized issue of timeliness would come to dominate this litigation. But the District Court did not even mention the requirements for fraudulent concealment or how the need to prove them might affect the predominance of common issues. [D.E. 186 at 76-79].

Even upon a superficial analysis of predominance, it is clear that the certified class cannot satisfy this requirement. Because each tolling class member must specifically allege "how the fraud kept the plaintiff in ignorance of a cause of action . . . and why there was a delay in discovering the fraud, despite the plaintiff's diligence," *Dual Inc. v. Lockheed Martin Corp.*, 827 A.2d 1095, 1105-06 (Md. 2004), an analysis of equitable tolling will require individualized inquiries. Indeed, the District Court ultimately decertified the *Minter* tolling class, citing grave concerns, based in the developed record, as to whether the *Minter* tolling class representative could satisfy the applicable requirements such as due diligence. [*Minter* D.E. 541 at 7-11]; *see also Thorn*, 445 F.3d at 321 (fraudulent

57

concealment inquiry requires "individual examination of testimony from each particular plaintiff to determine what he knew and when he knew it."). Furthermore, even with respect to timely claims, the litigation necessarily will be swamped with individualized questions about whether each class member in fact paid a finder's fee. *See* Section VII.A.2, *supra*.

The District Court's class certification decision rests on several fundamental errors. If this Court were to order any further proceedings in this case, therefore, the Court should first correct those errors and reverse the class certification order.

### B.    The District Court Incorrectly Applied A 12-Year Statute Of Limitations To Plaintiffs' FFA Claim

Even if Rule 23 could permit *some* class to be certified here, the District Court's decision to certify *this* massive class, covering Prosperity's entire history, rested on two legal errors:  (1) applying a 12-year statute of limitations to the FFA, and (2) including untimely claims through class-wide equitable tolling (as discussed above). Thus, even if the prerequisites of Rule 23 were otherwise met, as a matter of law the District Court could not have certified a class going back more than three years. This Court reviews the District Court's interpretation of Maryland limitations law *de novo*, *Singer v. Dungan*, 45 F.3d 823, 827 (4th Cir. 1995), and it should correct that erroneous interpretation before ordering any further proceedings.

58

"In Maryland, the default rule, for limitations purposes is that 'a civil action at law shall be filed within three years from the date it accrues.'" *AGV Sports Grp., Inc. v. Protus IP Solutions, Inc.*, 10 A.3d 745, 748 (Md. 2010) (quoting MD. CODE, CTS. & JUD. PROC. § 5-101). The District Court relied on an exception that allows a 12-year limitations period on a "[p]romissory note," "[b]ond," "[j]udgment," "[r]ecognizance," "[c]ontract under seal," or "any other specialty." MD. CODE, CTS. & JUD. PROC. § 5-102(a). But a statutory cause of action cannot be a "specialty" for limitations purposes unless it meets each of the following criteria: "(1) the duty, obligation, prohibition, or right sought to be enforced is created or imposed *solely* by the statute, or a related statute, and *does not otherwise exist as a matter of common law*; (2) the remedy pursued in the action is authorized *solely* by the statute, or a related statute; and (3) if the action is one for civil damages or recompense in the nature of civil damages, those damages are liquidated, fixed, or, by applying clear statutory criteria, are readily ascertainable." *Master Fin. Inc. v. Crowder*, 972 A.2d 864, 875 (Md. 2009) (emphases added). These criteria make "other specialt[ies]" a "relatively narrow catchall," and not every claim "that happens to be based in some way on a statute" will qualify. *Id.* "[S]tatutory specialties usually have involved an action of debt for a fixed or determinable sum." *Greene Tree Home Owners Ass'n v. Greene Tree Assocs.*, 749

59

A.2d 806, 821 (Md. 2000). Such "actions on formal instruments" are more

compatible with a long limitations period because they involve inherently more

"reliab[le] and durab[le] . . . evidence." *Id.* at 820 (citation omitted).

The District Court held, with no analysis, that the "specialty" exception

applied to the FFA. [D.E. 186 at 73]. The court relied on what it acknowledged

was "dicta" in a footnote in a "discovery dispute-related memorandum" issued by

Magistrate Judge Gauvey, even though it acknowledged that the limitations issue

had never been referred to the magistrate judge and that the issue was for the

District Court to decide. [D.E. 186 at 73] (quoting [D.E. 99 at 6 n.4]). And while

Magistrate Judge Gauvey's footnote *dictum* consisted of a single conclusory

sentence applying the three-part *Crowder* test, the District Court declared it

"correct" without further examination. [D.E. 186 at 72-73].

Under Maryland precedent – in particular *AGV Sports*, decided after

Magistrate Judge Gauvey's ruling – the FFA is not a "specialty" because it fails all

three prongs of the test.

Duty Created Solely By Statute: The FFA provides a statutory remedy for

conduct that was already actionable at common law. Even before the passage of

the FFA, Maryland common law permitted for the forfeiture of finder's fees where

brokers served simultaneously as agents of both a borrower and a lender. *See St.*

60

*Paul at Chase Corp. v. Mfrs. Life Ins. Co.*, 278 A.2d 12, 25, 28-29 (Md. 1971).

The FFA, which codifies that rule, therefore does not involve a duty "created or

imposed solely by the statute."

Rejecting a "specialty" claim in *AGV Sports*, the Maryland Court of Appeals

drew support from "the fact[] that the . . . conduct prohibited by the [statute] [is]

addressed by the common law actions of trespass to chattel and conversion." 10

A.3d at 753. Indeed, the statutory and common law claims "[we]re oftentimes

pursued in conjunction." *Id.* Here, the District Court had previously recognized

that plaintiffs were pursuing the *same theory* through the FFA and through

"common law claims for restitution and unjust enrichment" ([D.E. 49 at 2; *see also*

D.E. 188 at 66 n.30]), but Magistrate Judge Gauvey thought the common law

theories were merely "additional claims." [D.E. 99 at 6 n.4]. *AGV Sports* shows

the defect in that reasoning.

<u>Remedy Authorized Solely By Statute:</u>  Similarly, the remedy that plaintiffs

seek – a return of any finder's fee allegedly paid – is authorized by statute and

common law, and plaintiffs pursued both. Magistrate Judge Gauvey concluded

that the FFA provides a "remedy that is *heightened* from that available at common

law" and therefore "is *sufficiently* statutory to justify application of the specialty

statute." [D.E. 99 at 6 n.4] (emphases added). But the test is not whether the

statutory remedy is "sufficiently statutory"; rather it is whether the remedy pursued is "authorized solely by . . . statute." *Crowder*, 972 A.2d at 875. And the FFA's remedy – which merely trebles what is already available at common law – is not. *See Mayor & City Council of Balt. v. Household Fin. Corp.*, 176 A. 480, 482 (Md. 1935) (concluding that a refund statute was not an "other specialty" because it simply expanded the common-law restitutionary remedy).

Readily Ascertainable Damages: The FFA makes available two alternative remedies: treble the amount of the finder's fee collected, or the sum of $500. FFA § 12-807. Magistrate Judge Gauvey never suggested that the first option was "readily ascertainable."[21] Instead, she relied entirely on the notion that because *sometimes* a plaintiff may receive a $500 award, the statute *always* awards "readily ascertainable damages." *See* [D.E. 99 at 6 n.4]. But under Maryland law, "some . . . of the time" is not good enough. *AGV Sports*, 10 A.3d at 753. The Maryland Court of Appeals has *squarely rejected* an indistinguishable argument, involving another statute that, like the FFA, allows the plaintiff to elect $500 in statutory damages. There the plaintiff asserted that claims actually seeking the $500 remedy are "readily ascertainable" and can wait for 12 years. The Maryland high court

---

[21]    A return of finder's fees is "non-liquidated" damages because it requires a court to determine the actual amount of finder's fees. *See generally* Section VI.A.1, *supra*.

disagreed, noting that *Greene Tree* suggested the inadequacy of any assertion that "some, or even most of the time, the claims brought seek a remedy that is fixed or readily ascertainable." *Id.*[22]

The District Court's erred in concluding that each element of the "other specialty" test was met. Maryland's "default" three-year limitations period therefore applies to the FFA.

## VIII. CONCLUSION

Appellees/Cross-Appellants respectfully request that the judgment of the District Court entered on June 20, 2013 be affirmed in full.

---

[22]    Notably, here Magistrate Judge Gauvey's reasoning would apply the 12-year period even to claims seeking more than $500.

Respectfully submitted,

/s/ Irene C. Freidel                      /s/ John A. Bourgeois by permission
Irene C. Freidel                          Andrew Jay Graham
Brian M. Forbes                           John A. Bourgeois
K&L GATES LLP                             KRAMON & GRAHAM, P.A.
One Lincoln Street                        One South Street, Suite 2600
Boston, Massachusetts  02111              Baltimore, Maryland  21202
(617) 261-3100                            (410) 752-6030
Counsel for Wells Fargo Bank, N.A., and Wells Fargo Ventures, LLC


/s/ Jay N. Varon by permission
Jay N. Varon
Jennifer M. Keas
FOLEY & LARDNER LLP
3000 K Street, N.W.
Washington, D.C.  20007
(202) 672-5300
Counsel for Long & Foster Real Estate, Inc., Long & Foster Companies, Inc., and
Walker Jackson Mortgage Corporation


/s/ David L. Permut by permission
David L. Permut
William M. Jay
Sirisha V. Kalicheti
GOODWIN PROCTER LLP
901 New York Avenue, N.W.
Washington, D.C.  20001
(202) 346-4000
Counsel for Prosperity Mortgage Company


Dated:  October 17, 2013

64

# UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**No.** 13-1869        **Caption:** Petry, et al. v. Prosperity Mortgage Co., et al.

## CERTIFICATE OF COMPLIANCE WITH RULE 28.1(e) or 32(a)
Type-Volume Limitation, Typeface Requirements, and Type Style Requirements

1. **Type-Volume Limitation:** Appellant's Opening Brief, Appellee's Response Brief, and Appellant's Response/Reply Brief may not exceed 14,000 words or 1,300 lines. Appellee's Opening/Response Brief may not exceed 16,500 words or 1,500 lines. Any Reply or Amicus Brief may not exceed 7,000 words or 650 lines. Counsel may rely on the word or line count of the word processing program used to prepare the document. The word-processing program must be set to include footnotes in the count. Line count is used only with monospaced type.

   This brief complies with the type-volume limitation of Fed. R. App. P. 28.1(e)(2) or 32(a)(7)(B) because:

   [✓] this brief contains ____14,931____ [*state number of*] words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), *or*

   [ ] this brief uses a monospaced typeface and contains _____ [*state number of*] lines of text, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2. **Typeface and Type Style Requirements:** A proportionally spaced typeface (such as Times New Roman) must include serifs and must be 14-point or larger. A monospaced typeface (such as Courier New) must be 12-point or larger (at least 10½ characters per inch).

   This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

   [✓] this brief has been prepared in a proportionally spaced typeface using
   Microsoft Word 2010 _____ [*identify word processing program*] in
   Times New Roman, 14 point _____ [*identify font size and type style*]; **or**

   [ ] this brief has been prepared in a monospaced typeface using
   _____ [*identify word processing program*] in
   _____ [*identify font size and type style*].

(s) Irene C. Freidel _____

Attorney for Wells Fargo _____

Dated: October 17, 2013 _____

## CERTIFICATE OF SERVICE

I, Irene C. Freidel, do hereby certify that on October 17, 2013, I have caused to be served on all parties or their counsel of record the foregoing, through the CM/ECF system.

*/s/ Irene C. Freidel*
Irene C. Freidel